IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

DENNIS SPIKES                                                    PLAINTIFF

VS.                                     CIVIL ACTION NO. 1:11cv162WJG-RHW

BLESSEY MARINE, INC.;
BLESSEY MARINE SERVICES, INC.;
and FICTITIOUS DEFENDANTS A-F                              DEFENDANTS

<u>BENCH OPINION</u>

This cause came on for trial before the Court without a jury on February 25-26, 2013, on

Plaintiff Dennis Spikes' claims of negligence under the Jones Act, 46 U.S.C. § 30104(a), and

unseaworthiness under the general maritime law against the Defendants Blessey Marine, Inc.,

and/or Blessey Marine Services, Inc., (hereinafter collectively, "Blessey".) The evidence being

closed and both sides having finally rested their respective positions, the Court, after due

consideration of the evidence of record, makes the following findings of fact and conclusions of

law pursuant to Federal Rule of Civil Procedure 52(a)[1].

Plaintiff agrees in his proposed findings of fact and conclusions of law that no fictitious

Defendants were ever added or served and that those Defendants can be dismissed. The Court

has the inherent authority to dismiss *sua sponte* for want of prosecution. *Link v. Wabash R.R.*,

370 U.S. 626, 629-30 (1962). Accordingly, the Court finds that the fictitious Defendants A-F

listed in this case are dismissed, with prejudice.

This lawsuit arises out of an incident which occurred on April 10, 2010. Dennis Spikes,

[Spikes] alleges he suffered injuries on that date on the vessel M/V *HUGH MONSTED*

---

[1]*North Am. Capacity Ins. Co. v. Brister's Thunder Karts, Inc.*, 287 F.3d 412, 414 (5th Cir.
2002).

[*MONSTED*]. [1, p. 3.] At all material times, the tug *MONSTED* and Barge *WEB213* were owned and operated by Blessey. At the time of the incident at issue in this suit, Spikes was employed by Blessey as a tankerman, and assigned to the vessel *MONSTED*, under the direct supervision of Captain Roger Adams [Adams]. [D-17.] Spikes was a seaman within the meaning of the Jones Act; and he was acting within the scope of his employment with Blessey. [44, p. 8.]

Spikes claims that Blessey provided an unseaworthy vessel and committed negligence under the Jones Act and General Maritime Law, which proximately caused his injuries. [49, p. 1.] He claims additional maintenance and cure benefits, including the cost of medical attention, the service of physicians and nurses, the cost of hospitalization, medicines, and medical apparatus for the period of his disability, and attorney's fees, expenses, interest and punitive damages. [49, p. 2.] He contends that his injuries were a result of the incident on the *MONSTED* when he was securing the facewire.

In particular, Spikes claims that Blessey ordered Spikes to work under unsafe conditions without taking reasonable and necessary precautions to avoid Spikes' injury; failed to implement safe work procedures; to hire and maintain an adequate and competent crew; to maintain a seaworthy vessel; failed to have safe working procedures and policies; to provide prompt and adequate medical attention; failed to provide proper safeguards; failed to furnish the plaintiff with adequate and sufficient aid and assistance to perform his job; failed to comply with industry safety standards; and failed to maintain the vessel and its appurtenances in a safe and seaworthy condition. [49, p. 2.] Spikes seeks additional maintenance and cure benefits, including the various costs of medical attention for the period of his disability; attorney's fees and expenses; interest and punitive damages for Blessey's alleged failure to timely pay cure benefits without

2

good cause. (*Id.*)

Spikes had extensive prior training and experience as a deckhand and then as a tankerman before joining Blessey in 2007. [D-17.] He worked for two or three other towing companies involved in the liquid/petroleum/chemical trade beginning in approximately 1999. [53, pp. 14-15.] Spikes testified, and the official "Job Description – Tankerman" provided, "that bending, stooping, pushing, pulling, lifting and carrying are all part of the normal and customary duties of a tankerman" such as Spikes. [53, pp. 69-70; D-17 & 19.]

The *MONSTED* is a pushboat. [53, p. 17.] The wheelhouse of the *MONSTED* is elevated and is where the captain or pilot or the relief person at the wheel operates the vessel. [53, p. 18.] Below the wheelhouse is the main deck, and bow of the vessel. [53, pp. 18-19.] The push knees are used push the tug up next to a barge to move it. [53, p. 19.] The push knees are located in the front of the boat on the top deck of a boat like the *MONSTED*, and have a set of stairs which go up the back of the push knees. [53, p. 19.] The boat would attach to the barge using the timberheads and facewires. [53, pp. 19-21.] Facewires are the wires or ropes used to secure a pushboat to a barge. [53, p. 19.] The bow of the *MONSTED* has two winches to allow retrieval of any slack in each of the facewires, and securely fasten the barge to the pushboat. [53, pp. 19- 22.] This allows the boat to control the movement of the barge. [53, p. 22.] The facewire is let out in two ways. [53, p. 35.] The boat captain can release the winches and the wire using controls located in the wheelhouse. (*Id.*) In addition, the winch can be controlled on the deck. [53, p. 36.]

Pushboats such as the *MONSTED* generally work with barges which have either a boxed end bow or a rake bow. [53, pp. 19-20.] A rake bow is slanted, which allows the barge to be pushed through the water easier. [53, p. 20.] The *WEB213* had a rake bow. [53, p. 20.]

On the day of the alleged accident, the tug and barge were delivering a type of heavy oil, referred to as "No. 6" oil by plaintiff or "VGO" (vacuum gas oil). [D-9, D-10 and D-11.] The logs in this case show that the tug and barge arrived at the discharge terminal, the Motiva Dock near Norco, Louisiana, at about 8:15 PM on April 9, 2010. [D-10, D-23.] Spikes worked the early or "front" watch, 6:00 AM – noon and then 6:00 PM – midnight, so he would have been on duty when the tug and barge arrived at the dock and the tug "unfaced" from the barge. [53, pp. 23, 25; D-34, p. 45.] During the unloading procedure on April 10, 2010, Spikes was told that the product had cooled and thickened and could not be pumped ashore. [53, p. 25.] The Motiva dock did not allow barge heaters to be run alongside the dock so the crew of the *MONSTED* began arrangements to pull the barge away from the dock to go upriver to some pilings where the barge's heaters could be run. [53, p. 27.]

Spikes and deckhand Taylor Waguespack [Waguespack], along with Adams were involved in "facing up" the tug *MONSTED* at the rake end of the partially loaded barge *WEB213* to move them upriver. [53, p. 28.] Spikes was on the barge and Waguespack remained on the main deck of the *MONSTED*. [53, pp. 30-33.] Adams was in the wheelhouse. [53, p. 35.] To secure the tug to the barge, Waguespack had to climb the steps on the tug's push knee, grab the light-weight Spectra facewires, and hand the facewire up to Spikes. [P-21, pp. 15, 38-41.]

Spikes took the first facewire from Waguespack and put it on the timberhead. (*Id.*) Spikes testified during trial that there was no significant height difference between the deck of the barge and the tops of the push knees on the boat. [53, pp. 77-79.] The height differential between the deck of the barge and the top of the push knees was low enough to allow Spikes to reach with his hands and take the Spectra line from Waguespack. [53, pp. 32, 80-81.] Spikes had to get down

on one knee and reach down to get the second line from Waguespack. [53, p. 32.] Spikes testified that when he got the facewire he got back on his feet and straightened up. [53, p. 32.]

Spikes testified that he was on the barge and Waguespack was on the boat, passing the line to Spikes. [D-34, p. 64.] Spikes testified that there were no problems securing the port facewire under similar circumstances shortly before the accident. [53, p. 79.] Plaintiff specifically said that the port facewire, subject to the same height differential, was secured "pretty easily." [53, p. 31.]

Adams confirmed the facing up task was a routine job. [P-20, p. 100.] Nevertheless, he testified that he discussed the job with the men and gave them the general plan of action for facing up. [P-20, p. 121.] The bow of the barge to which the tug was facing up was "normal," no higher than other cases involving discharging from a barge, according to Adams. [P-20, p. 127.] Adams did not face up to the low end of the barge, because to do so would cause the wheel wash to overflow onto the barge and flood the pumps out on the barge. [P-20, pp. 124-5.] Adams thought the distance from the top of the push knee to the deck of the barge could have been about three feet. [P-20, p. 123.]

Adams positioned the *MONSTED* next to the elevated bow of the *WEB213*. Once the *MONSTED* was close enough, Waguespack handed the head line up to Spikes who successfully placed it on the cavil. [53, p. 31.] Plaintiff initially testified that the deck of the barge was "at least 30 feet" from the waterline. [D-34, p. 55.] He later testified that the tops of the 12 foot tall push knees were only 3½ feet below the deck of the barge. [D-34, pp. 56 & 73-4.] Spikes contends that the tug should have faced up to the lower stern of the barge, rather than the bow. [53, p. 87.]

5

From his working position on the deck of the barge, Spikes testified that he was able to reach with his hand and get the facewire from Waguespack. [53, p. 80.] Spikes got down on one knee and reached down for the line, which, according to Spikes, was partially submerged in the water. [53, pp. 80-2.] Spikes testified that he pulled the line out of the water, and as it was getting tight, he felt the pop in his back. [53, pp. 84-5.] Spikes contends that he was injured when he reached for the line with too much tension, which was caused by the height differential between the tug and the barge. [49, p. 8.] Waguespack stated that the line comes out of the side of the boat and that none of the line was in the water at the time of the incident. [P-21, p. 50.]

Spikes testified that the "lack of slack" in the facewire was the most important factor in causing his accident, but he had no good explanation for failing to refer to the lack of slack in the line in the Personal Injury Report. [53, pp. 87-9.] Spikes admitted at trial that he never told any of the doctors about the alleged lack of slack in the facewires:

> Q. So you kept telling people what happened, and you didn't mention the lack of slack that you now say was the main cause of your accident: is that correct?
>
> A. I'm guessing so.

[53, p. 90.]

According to Waguespack, Spikes bent at the waist, grabbed the Spectra line and secured it to the bitts, or cavils, on the barge. [P-21, p. 43.] After securing both facewires, Spikes returned to the tug and told Waguespack his back was hurting. [P-21, pp. 41-2.] Both Spikes and Waguespack stated that the Spectra line they were working with is lighter, more flexible and easier to work with than traditional facewires. [53, pp. 67-8; P-21, pp. 39-40.] A sample of the Spectra line was admitted in evidence to the Court. [D-38.]

The Personal Injury Report was completed by Adams and Spikes after the incident. [D-11.]

6

Adams spoke to Spikes about how the accident occurred, and then wrote that Spikes

"overreached" for the facewire and pulled a muscle in his upper back. [D-11, p. 2] Spikes wrote

his own *"detailed statement of what happened, how it happened and why it happened"* on the

Personal Injury Report. [D-11, p. 3.] Spikes wrote: "I was reaching down and bent down to get

face wire when I was stracting [sic] up and felt something give in my upper back." (*Id.*)

As captain of the boat, Adams stated that he was in charge of ensuring that the Blessey

Safety Procedures were followed during a facing up procedure. [P-20, p. 153; P-1[2].] Adams

noted that if there is insufficient slack, you cannot put the line in place. [P-20, p. 154.] While the

captain is responsible for insuring adequate slack in a line, the deckhand and tankermen are also

in a position to determine if more slack is needed. [P-20, pp. 154-55, 161.] Both men have radios

and either could have called the captain in the wheelhouse. [P-20, p. 135; P-21, p. 55; 53, pp. 76-

7.] Adams stated that to call him on the radio during the facing up procedure, Spikes would have

needed to have a hand free, because a person had to push a button on the radio to speak. [P-20,

pp. 135-6.] Spikes testified that he had two hands on the rope and was unable to radio the captain

to add slack in the line. [53, p. 87.] Plaintiff's trial testimony regarding the slack in the line is as

follows:

Q. So you got a hold of the line without any problems from Taylor and you started to step back?

A Correct.

Q. And you felt it get tight?

---

[2]Certain documents were introduced as exhibits to depositions. One of these documents was the Blessey Responsible Carrier Program, which incorporates Blessey's safety program, introduced during the bench trial as P-1.

A. Yes, sir. When I pulled, I walked – took a couple of steps back and pulled on it.

\* \* \*

Q.  Did you pull on it any after you realized there was not enough slack?

 A.  No, sir, I did not.

 Q.  The minute you felt it grow tight, you stopped?

 A.  Yes, sir. When I pulled it, then I felt it get tight. That's whenever I felt the pop in
 my back, and that was it.

[53, pp. 83-84.]

At trial, Spikes offered the testimony of James Patrick Jamison[3] [Jamison], introduced as an

expert master pilot and tugboat captain, who opined that Adams failed to conduct a Job Safety

Analysis [JSA] or Pre-Task Meeting before the April 2, 2010, face-up procedure. [53, pp. 114,

119, 120.] Jamison contends that this alleged failure was a violation of industry safety standards.

[53, p. 124.] Adams testified that a 5–10 minute pre-task meeting was held before the facing up

procedure started. [53, pp. 188-92.] According to Jamison, a proper JSA "…should have been 15

minutes or longer." [53, pp. 190-2.] Jamison emphasized that conducting this type of JSA was

critical because he says:  (1) the *WEB213* was listing; (2) Adams was facing up to a raked bow;

(3) the crew members were working in a blind spot, and (4) there were green or inexperienced

crew members. [53, pp. 121-4, 130.] Jamison could not point to any requirement for a JSA in

either the American Waterways Operators or the Responsible Carrier Program. [53, pp. 194-

195.]

Adams stated that the task was routine and did not call for any special instructions, beyond

the basic instructions with regard to lifting wires and such. [P-20, pp. 98, 100.] Raymond

_____

[3]Jamison has 46 years of experience in the wheelhouse. [53, pp. 108-112.]

8

Schaefer, vice president of Blessey and its 30(b)(6) designee, testified that JSAs were for "more of a more hazardous task." [P-23, pp. 49-50.] Spikes and Waguespack were informed by Adams that the barge had to be moved off the dock because the product had to be heated and that the tug would be facing up to the barge. [P-20, pp. 120-22.] Blessey had safety meetings weekly on the vessel, some of which involve training for safe work, including performing work in an awkward position. [53, pp. 71, 175; D-15.]

Jamison testified that Adams was responsible for enforcing Blessey's face-up safety procedures and that because Adams could not see his crew conducting these procedures, it was impossible for him to ensure that the procedure was safely executed. [53, p. 125.] Jamison has never been aboard the *MONSTED* or *WEB213*. [53, p. 168.] Jamison admitted that every tugboat or push boat in operation on the Mississippi River has certain obstructions to a captain's view. [53, p. 196.] He further admitted that he had never been in the wheelhouse of the *MONSTED* and used pictures from another vessel to visualize the *MONSTED*'s wheelhouse configuration. [53, p. 197.] He also did not measure how high the push knees or the rake of the barge was on the date of the incident. [53, p. 171.] Adams admitted that he could not:  (1) see Spikes or Waguespack perform the specific task where the Plaintiff was injured; or (2) see the incident when Spikes was hurt because of the blind spot caused by the radar in the wheelhouse. [P-20, pp. 76-77, 132, 164-5.]

The functional job description for tankerman prepared by Blessey for that position provides that different docks, barge drafts and river stages often make it necessary for an employee to "step across, up, down, or over an obstacle." [D-19, p. 4.] The tankerman must also be able to move "extremities and spine through full physiological range of motion that will permit the

9

employee to work in a variety of postures involving postures [sic] allowing reaching with hands

from deck level to overhead level." [D-19, p. 4.] "An essential part of a Tankerman's job is to

handle lines (thrown and catch lines, included.)" (*Id*.) Further, the description goes on to provide

as follows:

> Employee must be able to step with a step length of 2-ft. in the horizontal direction and
> 2-ft. in the vertical direction. Different docks, owned by individuals other than Blessey
> Marine Services, have various combinations of barge drafts and river stages which
> make it necessary to step across, up, down, or over an obstacle in order to gain access to
> the dock from the barge or from the barge to the boat or from the boat to the dock. Must
> also be able to safely walk and carry tools and line while crossing pipes, ledges, sills,
> catwalks, and/or climbing ladders and pushknees.

[D-19, pp. 3-4.]

Spikes also contends that the pike pole which he could have used to reach for the line was

broken at the time of the accident.[49, p. 8.] Waguespack testified that he had not used a pike

pole during a facing up procedure. [P-21, p. 45.] Adams stated that a pike pole would not be

useful in a facing up operation, because the pole would be too long. [P-20, p. 139.] He indicated

it would be difficult to use a 20 foot pike pole to reach down 2 or 3 feet to retrieve a line. [P-20,

p. 139.] Jamison testified that he concluded that the vessel did not have a working pike pole

based upon Waguespack and Adams not being able to recall if there was a functioning pike pole

on the *MONSTED* at the time of the accident and Spikes specifically testifying that the pike pole

was broken at the time of the accident and had been for some time. [53, pp. 137-8.] A third-party

safety audit was performed before and after Spikes' accident. [53, p. 174.] That inspection found

satisfactory the item marked "Boat hook/pike pole - stowage" for inspections performed on April

21, 2009, May 4, 2010, and August 4, 2010. [D-26, Blessey pp. 204, 213, 238, 247, 255, 264.]

The Court finds that Spikes' claims regarding the absence of a working pike pole on the date of

10

the accident are not credible, and further finds no reason to find the *MONSTED* unseaworthy because of any allegations concerning a pike pole.

Jamison claims that there was a safety issue on board the *MONSTED* because of inadequate slack in the line. [53, p. 132.] Jamison further claims that Adams was responsible for maintaining adequate slack in the line during the operation. (*Id*.) He concluded that the resistance of the line created by too much tension combined with the unusual lifting position required by the height differential between the barge and the tug to create an extremely unsafe work condition and caused the injury to Spikes's back and neck. [53, pp. 131-34.] Although Spikes testified at trial that lack of slack was an important factor in causing the accident, he did not put this reason in the personal injury report or tell his doctors that lack of slack in the face wire caused the accident. [53, pp. 87-90; D-11, p. 3.]

On April 10, 2010, Spikes was treated by James Patterson, M.D., for severe neck, thoracic and lumbar pain. [D-27, p. 1.] Spikes was described as walking stiffly, without turning his trunk or neck, with limited range of motion in neck, for all directions. (*Id*.) X-rays taken that day reveal the following findings: The lumbar alignment is anatomic with no evidence of fracture or subluxation. There is mild narrowing at L4-5 and L5-S1. Remaining disc spaces are well maintained. Impression: Minimal disc space narrowing L4-5 and L5-S1. No acute bony process. [D-27, p. 3.] Also, thoracic alignment is anatomic with no fracture or subluxation see. No focal lytic or blastic lesion. Impression: No acute bony process. [D-27, p. 4.] Finally, the radiology report from April 10, 2010, provides that cervical alignment is anatomic with no evidence of fracture or subluxation. Minimal degenerative endplate lipping and slight displacement narrowing noted at C5-6 and C6-7. Remaining disc spaces and prevertebral soft tissues are

within normal limits. Impression: Mild spondylotic change at C5-6 and C6-7. [D-27, p. 5.] Spikes was released to work with restrictions to avoid overhead work, heavy lifting, pulling, or pushing. [D-27, p. 6.]

Spikes was treated by Dr. Harris Evans at Internal Medicine of Long Beach, Mississippi, on April 14, 2010, which included a MRI of the cervical spine. [D-28, p. 20-21.] The following was reported: There are small central disk protrusions at C4-5 and at C6-7. There is a disk protrusion paracentrally to the right at C5-6. There does not appear to be foraminal impingement at that level. [D-28, p. 21.] That report was amended on May 7, 2012, to read disk protrusion at T6-7 paracentrally to the right impinging on spinal cord and on the neural foramen at that level. [D-28, p. 21.]

Spikes was referred to and treated by Dr. Eric Graham at the Spinal and Neurological Surgery of South Mississippi, on May 6, 2010. [D-29, p. 1.] At that time, he was diagnosed with a cervical and thoracic disc herniation. (*Id.*) Dr. Graham terminated Spikes' care on June 2, 2010. [D-29, p. 1.]

Dr. Michael C. Molleston assumed Spikes' care on May 18, 2010. [D-30, p. 1.] He stated that MRI scans of the cervical and thoracic spine show evidence of cervical disc rupture, worse at C5-6 to the right, and then thoracic ruptured disc worse at T6-7 to the right. There appears to be a fragment of disc in the thoracic spinal canal tilting and compressing the right side of thoracic cord at T6-7. (*Id.*) Dr. Molleston recommended surgery at T6-7, if therapy and the passage of time did not improve his symptoms. [D-30, p. 2.] Spikes underwent a right T6-7 laminectomy, facetectomy, discectomy, and transforaminal interbody fusion with a biomechanical interbody spacer device and a right-sided pedicle screws performed by Dr.

12

Molleston on August 30, 2010. [D-30, p. 1.]

On October 20, 2011, Dr. Eric Amundson prepared an independent medical evaluation following a referral from the Workers Compensation carrier by reviewing Spikes' medical records. [D-31, p. 1.] Dr. Amundson stated that at C5-6 there was a mild right paracentral disc bulge with no significant canal stenosis. [D-31, p. 2.] Dr. Amundson stated that at C6-7 there was also a mild disc bulge causing no significant canal stenosis. (*Id*.) He provides that the "personally reviewed" the MRI of the cervical spine from January 12, 2011, and compared it to the one taken April 19, 2010. (*Id*.) He indicates that the studies are identical and show a persistent right paracentral disc bulge with mild right foraminal stenosis with no significant canal stenosis. [D-31, p. 3.] He provides that there is mild central disc bulge with no significant canal or foraminal stenosis. (*Id*.)

Dr. Amundson states that "when the patient presented for a followup with Dr. Graham and Dr. Molleston, the possibility of thoracic myelopathy from a right T6-7 disc herniation arose with the possibility of a simultaneous injury having been sustained at C5-6. It would be very unusual to sustain both a cervical and a thoracic injury during the April 10, 2010, episode. Nevertheless, the patient's right lower extremity complaint certainly could not be explained by any cervical spinal cord or nerve root pathology." [D-31, p. 4.] In addition, Dr. Amundson provided that "The presence of osteophyte on the thoracic myelogram and post myelogram CT demonstrates the disc osteophyte complex existed prior to his accident two months prior. However, the patient was asymptomatic at that time." (*Id*.) Dr. Amundson did not see any need for cervical surgery, although he did recommend additional diagnostic studies, specifically an EMG nerve conduction study of the upper extremities. [D-31, p. 5.] He notes that as of October

20, 2011, he was unable to determine whether Spikes was at maximum medical improvement.

(*Id.*) Dr. Amundson evaluated Spikes' progress on April 11, 2012, and found that Spikes was at

maximum medical improvement and should be referred for a functional capacity evaluation. [D-

31, pp. 6-7.]

Dr. Eric Wolfson, a neurological surgeon who treated Spikes for neck and low back pain

beginning on August 21, 2012, stated that trauma is not necessary for disk herniations. [P-24, pp.

8, 26.] He testified as follows:

> Q. And, in fact, Mr. Spikes had disc bulges. Were those in the nature of what you could call degenerative disc bulges?
>
> A. It's really impossible to tell. Disc bulging occurs with degeneration of the spine, lumbar and cervical. It can also occur related to trauma, but there is no way to know unless you have an MRI the day before and the day after to see.
>
> Q. Do you sometimes see more pronounced focal herniations in the case of a traumatic disc bulge or traumatic disc rupture?
>
> A. Sometimes, but, again, patients can wake up with a focal disc herniation and wake up with severe neck and arm pain and have no trauma at all.
>
> Q. So disc bulges or herniations can occur for any number of reasons; correct?
>
> A. Yes.
>
> Q. And do you see patients who simply wake up with disc problems that you diagnose as a ruptured disc?
>
> A. Yes. That is actually more common than trauma.
>
> Q. And in this case you don't have anything to relate these discs to the trauma other than Mr. Spikes' history; is that correct?
>
> A. That's correct.

[P-24, pp. 26-27.]

Dr. Wolfson recommended an anterior cervical diskectomy and fusion with instrumentation

at C5-6 and C6-7. [P-24, p. 11.] Dr. Wolfson stated that the surgery was related to the accident

on April 10, 2010. [P-24, p. 12.] Dr. Wolfson testified that plaintiff had osteophytes on the MRI

scans taken shortly after the accident. [P-24, p. 25.] Osteophytes take months, usually years to

develop. (*Id.*) MRI scans recommended by Dr. Evans showed disk protrusions at T6-T7, C4-C5,

C5-C6 and C6-C7. Degenerative changes were evident in the cervical vertebral bodies.

According to Dr. Wolfson, the surgery was a success and most of Spikes' presurgical pain

symptoms were relieved, with improvement of his right arm symptoms also. [D-24, pp. 15-17.]

Spikes should reach maximum medical improvement no later than 12 weeks post surgery,

according to Dr. Wolfson. [D-24, p. 17.] Dr. Wolfson stated that the bill for this procedure was

$13,810 as of the date of Dr. Wolfson's deposition, which was November 12, 2012. [D-24, cover

page & p. 22.]

Dr. Molleston found hypertrophic spurs at T5-6 and T6-7 as shown on the MRI taken in

June 2010. [P-22, p. 68.] Dr. Molleston stated that a hypertrophic spur is a calcification or a bone

spur which develops over a period of time. (*Id.*) Dr. Molleston stated in his notes from May 18,

2010, that Spikes suffered a thoracic herniated disc at T6-7, a cervical sprain and cervical

herniated disc, and possible lumbar sprain. [P-22, Exh. 2, p. 2; D-30.] Dr. Molleston, testified in

his deposition as follows:

Q. Okay. Do you find it somewhat unusual for a 32 year-old man to suffer this much
damage to two different areas of his spine doing what Mr. Spikes said he was doing?

A. I think so, yeah. Dr. Amundson made some comments about, almost saying it was
physically impossible or something like that. I don't think I would go so far to say it
was physically impossible, but I am not being paid $3,000 to write a letter for it. **I do
think it is unusual. I think thoracic disk herniations are pretty unusual.**

Q. And that's because there's not a lot of motion in the thoracic region. Is that correct?

15

A. Right. And a lot of times I think they are asymptomatic.

[P-22, pp. 65-6.] (Emphasis added.)

Waguespack testified that plaintiff complained of back problems before the alleged accident. [P-21, pp. 52-3.] According to physicians, Spikes had pre-existing problems with his spine, as shown by MRI scans recommended by Dr. Evans which revealed disk protrusions at T6-T7, C4-C5, C5-C6 and C6-C7. Degenerative changes were evident in the cervical vertebral bodies. [D-30.]

Blessey paid for thoracic spine surgery under the broad maintenance and cure obligation, and has continued to pay maintenance of $25.00 per day through the date of the bench trial. Blessey asserts that the cervical surgery performed on September 19, 2012, was elective. [Post trial brief, p. 23.] Blessey maintains that Dr. Amundson performed a medical examination in October 2011 at which time Dr. Amundson concluded that cervical surgery was unnecessary and that Spikes had reached maximum medical improvement [MMI]. [D-35, pp. 47-8, 50.] Dr. Wolfson stated that Spikes did not reach MMI until twelve weeks following the cervical surgery in September 2012.  [D-24, p. 17.] The Court will examine the parties' positions as follows.

<u>Legal Analysis</u>

Spikes claims that the defendants provided an unseaworthy vessel, committed negligence under the Jones Act and General Maritime Law which caused his injuries. [49, p. 1.] Questions of negligence and causation in admiralty cases are treated as factual questions. *Landry v. Oceanic Contractors, Inc*., 731 F.2d 299, 302 (5th Cir. 1984). Even the slightest negligence is enough to sustain a finding of Jones Act liability. *Theriot v. J. Ray McDermott & Co.,* 742 F.2d 877, 881 (5th Cir. 1984). Each of Spikes' claims will be addressed below.

16

I.   Unseaworthiness

Spikes contends that the defendants failed to keep and maintain the ship and its equipment in a seaworthy condition. [1, p. 5.] A ship owner is strictly liable for personal injuries caused by his or her vessel's unseaworthiness. To be seaworthy, a vessel and its appurtenances must be reasonably suited for the purpose or use for which they were intended. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960); *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002). To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness. *Phillips v. Western Co. Of N. Am.*, 953 F.2d 923, 928 (5th Cir. 1992). Under general maritime law, unseaworthiness can be manifested by an unsafe method of work, such as the failure by a shipower to provide adequate equipment for the performance of an assigned task. *Vargas v. McNamara*, 608 F.2d 15, 18 (1st Cir. 1979). Significantly, liability for unseaworthiness does not require any showing of a defendant's negligence. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 517-18 (1971).

"A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit." *Usner,* 400 U.S. at 496.  An isolated instance of negligence does not render a vessel unseaworthy but a crew's lack of training for the task does render a vessel unseaworthy. *See Marceaux v. Conoco, Inc.*, 124 F.3d 730, 734-5 (5th Cir. 1997). Spikes testified that he went through deckhand and tankerman training at another employer. [53, p. 14; D-34, pp. 20-23.] Waguespack also underwent training in deckhand school, which included training in handling facewires. [P-21, pp. 20, 22-23.] The

17

Court finds no merit to the claim that the *MONSTED* was unseaworthy due to inadequate crew training.

According to Spikes, a functional pike pole was not available which he claims was a violation of Blessey's Safety regulations and the Responsible Carrier Program. [49, p. 13.] A pike pole is used to retrieve buoy lines and pull facewire up off the boat. [53, p. 134.] Spikes stated that the only functioning pike pole was on another barge. [53, p. 37.] Spikes further stated that if he had a pike pole, he could have used it to reach the facewire from Waguespack. [53, pp. 38-9.] According to inspection reports before and after the accident, a pike pole was available on the tug. [D-26, pp. 213, 247, 264.] No mention was made that the pike pole was broken, although other areas had notations of upgrades or maintenance needed. [*i.e.*, D-26, p. 255.] In addition, Adams testified that the pike pole would have made the job more awkward to perform. [P-20, p. 139.] To recover under an unseaworthy claim, the "'plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.'" *Brister v. AWI, Inc.,* 946 F.2d 350, 355 (5th Cir. 1991)(quoting *Johnson v. Offshore Express, Inc.,* 845 F.2d 1347, 1354 (5th Cir.), *cert. denied,* 488 U.S. 968 (1988)). The Court finds that the allegations advanced regarding the pike pole did not render the *MONSTED* unseaworthy.

In addition, Spikes contends that Adams failed to conduct a Job Safety Analysis or Pre-Task Meeting in violation of industry standards, as testified to by Jamison. [49, pp. 7-8; 53, p. 120.] Spikes asserts that the failure to conduct a JSA was unreasonable and created an unsafe condition which caused Spikes' injuries. Jamison opined that the pre-task meeting should cover any vessel maneuvering which may take place; safety procedures; the availability of

18

communication between the seaman on deck and the officer in control of the vessel; and the use of hand-free communication devices. [53, pp. 121-7.] Jamison further opined that a safety meeting is essential when the operation utilized an inexperienced seaman such as Waguespack. [53, p. 122.]

Spikes claims that Adams failure to conduct the JSA relating to the face-up procedure violated industry standards and Blessey's safety procedures thereby causing Spikes' injuries. Compliance with industry practice or custom in the trade is relevant to the issue of unseaworthiness, but is not the standard. *See Webb v. Dresser Indus.,* 536 F.2d 603, 607 (5th Cir. 1976). Customary or normal industry practice alone does not establish seaworthiness. *June T., Inc. v. King,* 290 F.2d 404, 406 (5th Cir. 1961); *Johnson,* 845 F.2d at 1355. The Court finds that Spikes' claim that the *MONSTED* was unseaworthy due to allegations that industry customs or standards were not followed on the day of his accident is without merit.

Jamison contends that because Adams was responsible for enforcing safety procedures and because Adams could not see the crew at the time of the procedure, he was not able to do his duty of ensuring the safety of the crew during the face-up procedure. [53, pp. 125-6.] Adams also allegedly caused a dangerous work situation and his failure to provide adequate slack in the wire resulted in making the wire harder to handle and provided too much resistance which placed Spikes in a position which caused him to strain to pull up the facewire. [53, pp. 131-4.] According to Jamison, the resistance of the wire and the unusual lifting position required by the height differential between the barge and the tug created a condition which caused injury to Spike's back and neck. [53, pp. 131-4.] Spikes has not shown that he asked for help in handling the facewire, and has not shown that this task was one which could not have been safely

19

performed without direct supervision from the captain, or without additional equipment. In this case, the lack of instruction or supervision was not a cause of the accident. Spikes failed to show that he would have done anything differently if he had been instructed further or provided with additional supervision.

The Court finds that Spikes suffered an aggravation of his existing condition when he moved the facewire. The task of moving facewire is a job that Spikes performed many times before, and is not a dangerous job. The accident report does not attribute Spikes' injury to any action or failure to act on the part of Waguespack. There is no evidence to show that anyone on the *MONSTED* failed to exercise normal reasonable care under the circumstances.

The Court concludes that *MONSTED* was not unseaworthy at the time of Spikes' accident. Spikes presented no evidence that the vessel, its gear, or appurtenances were in any way defective or contributed to his injury, and did not establish that the *MONSTED* was manned by an unfit crew.

II.   Jones Act Claim

The Jones Act provides a remedy for a seaman injured as a result of negligence. *See Norfolk Shipbuilding & Drydock Corp. v. Garris,* 532 U.S. 811 (2001). The plaintiff must prove by a preponderance of the evidence that the vessel owner's negligence proximately caused his injuries. *See Chisholm v. Sabine Towing & Transp. Co.*, 679 F.2d 60 (5th Cir. 1982). The employer is held to a standard of ordinary care under the circumstances. *Gautreaux v. Scurlock Marine, Inc*., 107 F.3d 331, 335 (5th Cir. 1997). The seaman is obligated under the Jones Act to "act with ordinary prudence under the circumstances" to protect himself from injury. *Johnson*, 845 F.2d at 1352. A Jones Act employer is not liable merely because a plaintiff is asked to

perform heavy manual labor or strenuous work. *Martinez v. Sea-Land Serv., Inc*., 637 F. Supp. 503, 506 (D. P.R. 1986). In Jones Act cases, "cause in fact" is  a necessary ingredient of liability.

Spikes claims that the unavailability of a pike pole, and allegations regarding a lack of slack in the line, or some negligence on the part of Adams was the cause of his injury and renders Blessey liable under the Jones Act. Spikes was injured while reaching for the facewire used to secure the tug to the barge. The evidence does not support a finding that Blessey was negligent in this operation. Spikes had many years of experience in facing up and securing a barge to the tug. [53, pp. 14, 28-30.] Both individuals were provided training for their jobs. There was no negligence involved in the length of the meeting prior to performing the facing up procedure, and a JSA was not required because the testimony has established that this was a routine task, not a critical task.

There is no evidence that a pike pole was necessary to perform the task at hand. The testimony was that a pike pole would have hindered rather than helped the task at issue in this suit. The failure to use an available mechanical means (the pike pole) did not render the manual means of doing the job unsafe, given the lack of evidence that the manual method itself was unsafe. *Rogers v. Eagle Offshore Drilling Services, Inc.,* 770 F.2d 549 (5th Cir. 1985). Accordingly, the Court finds that Spikes has not shown that the negligence of Blessey employees or agents played "any part, even the slightest" in causing Spikes' injury. *See Rogers v. Missouri Pacific R.R.,* 352 U.S. 500, 506 (1957). Spikes has not established that Blessey provided a working condition or method of work that was not reasonably safe and fit and that rendered the *MONSTED* liable in this case. Spikes cannot avoid the principle that in Jones Act cases, cause in fact, is a necessary ingredient of liability. Spikes sustained injury to his back, which had

preexisting problems, while securing the facewire, which everyone concedes to be no more than a normal hazard of his work. He has not established that either negligence or unseaworthiness were the cause of the aggravation of his preexisting condition. *Chisholm*, 679 F.2d at 62. The Court finds that Spikes failed to establish that Blessey was negligent in this case.

Under the Jones Act and general maritime law, an injured seaman is entitled to monetary recovery for past, present and future loss of earning capacity and wages, medical expenses, and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness. *Nichols v. Weeks Marine, Inc.*, 513 F. Supp. 2d 627, 637 (E.D. La. 2007). Because the Court has found that Spikes has failed to prove unseaworthiness or negligence, Blessey is not liable for such damages in this case.

III.  Maintenance and Cure

A seaman injured while in the service of the ship is entitled to recover maintenance and cure benefits from his employer or the shipowner, until the time of maximum cure. *Hall v. Noble Drilling*, *Inc.*, 242 F.3d 582, 586 (5th Cir. 2001). Recovery for maintenance and cure is available to any seaman who is injured while in the service of his ship and the seaman's own negligence, if any, will not bar recovery. *Vaughan v. Atkinson*, 369 U.S. 527 (1962). Spikes was paid maintenance since the date of his accident through the trial date. [51, p. 2.]

A shipowner's duty to pay maintenance and cure is "virtually automatic." *Baucom v. Sisco Stevedoring, LLC,* 506 F. Supp.2d 1064, 1073 (S.D. Ala. 2007). A shipowner must pay maintenance and cure to a seaman who proves, by a preponderance of the evidence, the following:  (1) he was employed as seaman, (2) his injuries or illnesses occurred, manifested, or were aggravated while in the ship's service, (3) the wages to which he is entitled, and (4)

22

expenditures for medicines, medical treatment, board, and lodging. *Johnson v. Cenac Towing Inc.,* 468 F. Supp.2d 815, 832 (E.D. La. 2006), *vacated on other grounds,* 544 F.3d 296 (5th Cir. 2008)). The seaman's burden is "relatively light." *Freeman v. Thunder Bay Transp. Co.,* 735 F. Supp. 680, 681 (M.D. La. 1990). "The right terminates only when maximum cure has been obtained." *Bertram v. Freeport McMoran, Inc*. 35 F.3d 1008, 1012 (5th Cir. 1994). Maximum cure is achieved when it is probable that further treatment will result in no betterment of the claimant's condition. *Rashidi v. American President Lines*, 96 F.3d 124, 128 (5th Cir. 1996). Maximum cure can be declared if the condition is incurable or if further treatment will only relieve pain and suffering. *See Pelotto v. L&N Towing Co.*, 604 F.2d 396, 404 (5th Cir. 1979). In other words, the shipowner is obliged to pay maintenance and cure until the seaman has reached the point of maximum cure, that is until the seaman is cured or his condition is diagnosed as permanent and incurable. *See Vella v. Ford Motor Co.,* 421 U.S. 1, 5 (1975); *Vaughan,* 369 U.S. at 531.

Maintenance and cure may be awarded "even where the seaman has suffered from an illness pre-existing his employment." *McCorpen v. Cent. Gulf S.S. Corp.,* 396 F.2d 547, 548 (5th Cir. 1968), *cert. denied* 393 U.S. 894. The defendants' claim that Spikes' injuries were caused by a pre-existing degenerative process in his back; however, maintenance and cure may still be awarded to Spikes notwithstanding a pre-existing condition so long as the condition was not deliberately concealed and is not disabling at the time the seaman signs on for the voyage. If the underlying condition is aggravated or manifests itself while the seaman is in the ship's service, maintenance and cure is due the seaman. *Fostrer v. Brian's Trans. Serv.,* 1993 WL 114528 (E.D. La. 1993)

Maintenance and cure "does not hold a ship to permanent liability for a pension, neither does it give a lump-sum payment to offset disability based on some conception of expectancy of life." *Farrell v. United States,* 336 U.S. 511, 519 (1949). Instead, the duty "extends during the period when [the seaman] is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery." *Vaughan v. Atkinson,* 369 U.S. 527, 531 (1962) (citing *Calmar S.S. Corp. v. Taylor,* 303 U.S. 525, 528,  (1938)); *accord Pelotto,* 604 F.2d at 400. "When it appears that a seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved." *Pelotto,* 604 F.2d at 400. Maintenance and cure is the implied right of the seaman arising from his or her employment relationship with the shipowner and is "independent of any other source of recovery for the seaman (e.g., recovery for Jones Act claims)." *Bertram,* 35 F.3d 1008 at 1013. Thus, whether the seamen or employer was negligent is not at issue. *Brister,* 946 F.2d at 360; *Jauch v. Nautical Services, Inc.,* 470 F.3d 207, 212 (5th Cir. 2006). Maintenance is the seaman's right to food and lodging and cure is the seaman's right to necessary and appropriate medical services, and both rights extend to the point at which the seaman reaches MMI. *See Breese v. AWI, Inc.,* 823 F.2d 100, 104 (5th Cir. 1987)

In this case, Dr. Molleston advised Spikes that he needed a second surgery to repair the cervical herniation at C6-7 [P-22, p. 36.] Dr. Wolfson agreed with Dr. Molleston's diagnosis and performed an anterior cervical discectomy and fusion with instrumentation at C6-7 on September 19, 2012. [P-24, pp. 10-12.] Although the Plaintiff presented evidence of the need for further "lifetime" care, the Court finds that such care is not part of Blessey's obligations to Spikes. Spikes further argues that he has loss of gainful employment, loss of earning capacity and total

24

disability as a result of the incident on the *MONSTED*.

Here, the parties' medical experts disagree over whether Spikes' September 2012 surgery was medically appropriate. Under the Jones Act, "a seaman is entitled to recovery . . . if his employer's negligence is the cause, in whole or in part, of his injury." *Gautreaux,* 107 F.3d at 335. Under the general maritime law, a seaman is entitled to receive proper medical treatment and care, and the employer has a duty to provide such care up until the point that "it is probable that further treatment will result in no betterment of the claimant's condition." *Boudreaux,* 280 F.3d at 468. Whether an operation will improve an individual's condition or whether an individual has reached the point of maximum medical improvement is a medical question. *See Rashidi,* 96 F.3d at 128 (citing *Breese,* 823 F.2d at 104.)

Dr. Amundson testified that surgery would not improve Spikes' condition because, in his opinion, the nerve conduction studies and myelogram/post-myelogram CT scans were normal and a good surgical result would not be achieved due to Spikes' multi-level disc degeneration or spondylosis. [D-31, pp. 43-4.] Dr. Molleston recommended the cervical surgery at C6-7 because Spikes continued to suffer pain, headaches, numbness and other complications following the thoracic laminectomy. [P-22, p. 26.] He also stated that Spikes was not prevented from engaging in sedentary work, with some accommodation made to alternate his sitting and standing, and not requiring Spikes to sit or stand for more than an hour. [P-22, pp. 39-43.]

After the cervical surgery, Spikes reported that his symptoms had improved; he gained strength in his hand and leg, the headaches have been alleviated, although he still experienced some residual pain. [53, p. 45; D-24, pp. 15-17.] An individual's sensation of pain is inherently subjective, but credible evidence shows that Spikes obtained relief after having undergone

surgery. The Court finds that the cervical surgery was medically necessary to improve Spikes'

condition caused by the accident of April 2010 and that he did, in fact, improve following the

cervical surgery.

Spikes' ongoing complaints of pain suggests that he is suffering from a medical condition at

this time which can be improved or cured, however, a recommendation for relief or management

of pain alone does not prevent a finding of MMI. *See Pelotto,* 604 F.2d at 400. If 'future

treatment will merely relieve pain and suffering,' then MMI has been reached." *Gorum v. Ensco*

*Offshore Co.,* 2002 WL 315284460, *5 (E.D. La. 2002). Here the evidence establishes that

Spikes reached maximum cure in December 2012 because Spikes should reach maximum

medical improvement no later than 12 weeks following the cervical neck surgery, according to

Dr. Wolfson. [D-24, p. 17.] The Court finds that Spikes reached MMI on approximately

December 17, 2012, according to Dr. Wolfson. Accordingly, the Court finds Blessey should pay

the cost of the cervical surgery. In addition, the parties should resolve the issue of any payments

already made on the cervical surgery by third parties and any issue regarding payments Blessey

may have made toward maintenance and cure beyond the date of Spikes' MMI.

The Court finds Spikes is not entitled to further economic damages for lost wages.

A seaman is entitled to seek punitive damages for his employer's alleged willful and wanton

disregard of its maintenance and cure obligation. *Atlantic Sounding Co. v. Townsend*, 557 U.S.

404 (2009). In this case, Blessey has honored its maintenance and cure obligation. The Court

concludes that Spikes is not entitled to a punitive damage award.

IV.  Pre-Judgment Interest

Pre-judgment interest may be awarded in admiralty cases if appropriate. The Court finds that

in this case an order of pre-judgment interest is not appropriate. Spikes was paid maintenance and cure up to the date of trial in this case, which was beyond the period of MMI provided by Dr. Wolfson following the cervical surgery. Although Blessey is found to be responsible for payment for the cervical surgery, payment for that surgery was made by Spikes' private insurance carrier.  "Prejudgment interest is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Jauch,* 470 F.3d at 214-15. Spikes sustained no loss of use of that money. The Court finds no reason to award pre-judgment interest on that amount in this case. *See Doucet v. Wheless Drilling Co.,* 467 F.2d 336, 340 (5th Cir. 1972).

Conclusion

For the reasons discussed herein, the Court finds that the accepted facts and law support the conclusion that the plaintiff has failed to prove that the *MONSTED* was unseaworthy, or that Blessey is liable for Jones Act negligence. In addition, the Court finds that Blessey is responsible for maintenance and cure related to the incident at issue in this lawsuit up to the time of Spikes' MMI, which was December 17, 2012. In addition, the Court concludes that Blessey should pay the expenses related to the cervical surgery which Spikes underwent on September 19, 2012. The parties should resolve the issue of any payments already made on the cervical surgery by third parties and any issue regarding payments Blessey may have made toward maintenance and cure beyond the date of Spikes' MMI. The Court finds that Spikes is not entitled to further economic damages for lost wages, and is not entitled to a punitive damage award. The Court finds that the fictitious Defendants A-F listed in this case are dismissed, with prejudice. Finally, the Court finds that each party is to pay their respective costs associated with this lawsuit. A separate Final

27

Judgment in conformity with and incorporating by reference the foregoing Bench Opinion shall issue this date.

DATED, this the 9th day of December, 2013.

_Walter J. Gex_ **III**
UNITED STATES SENIOR DISTRICT JUDGE